**Richard JONES, Plaintiff,**

v.

**James GREER, Warden, Neil Hartigan, Attorney General, Defendants.**

No. 83–3140.

United States District Court,
C.D. Illinois,
Springfield Division.

Feb. 12, 1986.

Richard Jones, pro se.

Warren J. Nickel, Asst. Atty. Gen., Chicago, Ill., for defendants.

### OPINION AND ORDER

MILLS, District Judge:

Habeas corpus.

Denied.

Jones brings this action for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his Illinois state court conviction for attempted murder, home invasion, and armed robbery, and the resulting 50-year sentence. The gravamen of Petitioner's complaint is that improper evidentiary rulings and prosecutorial misconduct rendered his trial fundamentally unfair. For the reasons stated below, Jones' petition for a writ of habeas corpus is denied.

### Background

On February 27, 1981, Glen Mabus was alone in his rural Carlinville home. While working in the basement, he heard someone at the door and, thinking it was his wife, went upstairs. He observed a car in the driveway which he later described as a late model, light blue or bluish-green Chevrolet. Mabus proceeded into the bedroom, where he encountered a black male armed with a handgun. The assailant took money from Mabus and asked him where he kept his guns. He told the assailant his guns

were located in the basement. Mabus was then taken into the basement and forced to sit in a chair. Sometime after taking one of Mabus' guns off the wall, the assailant shot Mabus in the face from a few feet away. Mabus survived the attack and managed to crawl up the basement stairs and call for help.

At trial, Mabus identified Jones as his attacker, and also testified that numerous items from his house were missing following the attack. A 12-person jury found Jones guilty of attempted murder, armed violence, home invasion, aggravated battery, armed robbery, burglary, and theft. The Appellate Court of Illinois affirmed Jones' conviction of attempt, home invasion, and armed robbery, but vacated the other convictions. *People v. Jones*, 108 Ill.App.3d 880, 64 Ill.Dec. 346, 439 N.E.2d 1011 (4th Dist.1982). Further appeal was denied by the Illinois Supreme Court.

### Evidence at Trial

Richard Jones was employed as a meat-packer at the Diamond Meat Packing Plant. On the morning of February 27, however, Jones did not ride to work with co-workers as was his usual routine. Instead, Jones later rode with a friend to the plant. There Jones met Barbara Grizzle and they decided to go drinking together in a car loaned to Jones by a co-worker. The car was a late model, blue-green Chevrolet. Ms. Grizzle testified at trial that Jones had displayed a gun to her while they were drinking together. In addition, she believed that the gun—later identified as the gun which was used in the shooting—was the same gun Jones had shown her.

After drinking for awhile, Jones and Ms. Grizzle drove back to the plant and then at about 4 p.m. left again. They drove to a point where the road curved and pulled off to the side. As they were parked by the side of the road, two men who knew Ms. Grizzle drove by. Upon seeing her in the car with Jones, they stopped, had some conversation with her, and took her with them. Among the state's witnesses was a truck driver, Mr. MacMurdo, who testified that he remembered following the car driven by these two men, and that they pulled

in to meet a green car parked along this curve. The two men themselves—Paul Taylor and Bill Jefferson—stated that they went past the curve and saw the black man in the green Chevrolet with Ms. Grizzle and that they turned around and drove back to the green car. All of this testimony placed Jones less than three miles from the Mabus home sometime after 4 p.m. The crime itself occurred sometime between 4:35 and 4:50 p.m., when Mr. Mabus called the police for help.

Jones was arrested outside the Diamond Meat Packing Plant by the Macoupin County Sheriff's Department shortly after the incident. When he was arrested, several items that had been taken from the Mabus home were found in a nearby culvert. At the time of the arrest, Jones was wearing blue jeans and a blue vest. In addition to identifying Jones as the assailant, Mabus testified that his attacker wore jeans and a short blue coat that either had no sleeves or short sleeves. Detective Zirkelbach also testified that Mabus gave an identical description of his attacker immediately after the incident. Over hearsay objections, the trial court admitted Mabus' description of the attacker given to police approximately 15 minutes after he was shot.

At the time of the arrest, Jones was driving a green late model Chevrolet. In addition to Mr. Mabus, several witnesses testified that they saw a bluish-green or green late model Chevrolet at the Mabus residence at approximately the time of the attack. Other witnesses testified that this car belonged to Stanley Huddleston, a co-worker of Jones'. Huddleston testified that he had loaned Jones his car that day.

The day after the arrest, police found a .22 caliber colt automatic pistol in Gleason's Pond, near the area where Jones was arrested. Police also found an empty .22 caliber shell casing in the basement of Mabus' residence. A forensic scientist identified the shell casing as having been fired from the handgun found in Gleason's Pond. Also found at the Mabus residence was a single glove. According to police, a glove apparently matching the one found in the

Mabus home was laying on top of the car when Jones was arrested.

The final piece of evidence against Jones—admitted over objection—was expert testimony by a forensic scientist identifying stains on Jones' undershirt as blood stains. It could not be conclusively determined, however, whether the blood was human or animal blood.

Jones' theory at trial was that he had not been anywhere near the Mabus residence at the time of the incident and that he was the target of a police conspiracy. Jones testified that he was at home sleeping the afternoon of the attack, but no other witness could corroborate this fact. On cross-examination, Jones stated that he believed that most of the state witnesses were either lying or were mistaken, and that Detective Zirkelbach (the chief investigating officer) was out to get him. Apparently, Jones had previously been charged for an offense which Detective Zirkelbach had investigated, but which resulted in two hung juries. In Jones' opinion, Detective Zirkelbach harbored ill-will toward him, and would do anything to see him put in prison.

Jones lists five primary grounds for habeas relief:

1. that the trial court erroneously admitted expert testimony that stains found on Jones' undershirt were blood stains;

2. that the trial court erred in allowing Detective Zirkelbach to remain in the courtroom throughout trial;

3. prosecutorial misconduct during cross-examination of Jones;

4. prosecutorial misconduct during closing arguments; and

5. erroneous admission of Mabus' hearsay statement to police concerning the description of his attacker.

### Standard of Review

■ To serve as a basis for habeas corpus relief, Jones' charges of prosecutorial misconduct and improper evidentiary rulings must amount to a denial of a specific constitutional right or a denial of a fundamentally fair trial. *U.S. ex rel. Shaw v. DeRobertis,* 755 F.2d 1279, 1281, n. 1 (7th

Cir.1985); *U.S. ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1014 (7th Cir.1984). Improper admission of evidence may rise to the level of a due process violation only if the probative value of the evidence is greatly outweighed by prejudice to the Defendant. *United States ex rel. Bibbs v. Twomey,* 506 F.2d 1220, 1222 (7th Cir. 1974); *U.S. ex rel. Bartall v. Lane,* 607 F.Supp. 409 (N.D.Ill.1985). The issue facing this Court therefore differs from that previously faced by the Appellate Court of Illinois: Here, the question is not simply whether the evidentiary rulings were incorrect, but rather whether, in light of the entire record, the rulings so prejudiced Jones as to deprive him of a fair trial in violation of the Fourteenth Amendment. *Bartall,* 607 F.Supp. at 415 (*citing Phelps v. Duckworth,* 757 F.2d 811, 820 (7th Cir. 1985)). In determining whether such prejudice has occurred, the strength of the prosecution's case and the extent to which it is dependent upon the evidence erroneously admitted are relevant factors. *United States ex rel. Palmer v. DeRobertis,* 738 F.2d 168, 170 (7th Cir.1984).

■ The same analysis applies to allegations of prosecutorial misconduct. To justify relief under the Fourteenth Amendment, a habeas petitioner must show that prosecutorial misconduct so undermined his trial's fairness as to make his conviction a deprivation of liberty without due process of law. *United States ex rel. Crist v. Lane,* 745 F.2d 476, 482 (7th Cir.1984). To carry this burden, he must show that it is at least likely that the misconduct complained of affected the outcome of his trial. *Shaw,* 755 F.2d at 1281, n. 1. As explained by this Circuit in *Crist:*

> The focus of federal due process review is to ensure that alleged improper prosecutorial argument does not warp the factfinding function of the jury by deflecting its attention away from consideration of the evidence presented at trial ... The essence of due process is fundamental fairness. The Constitution guarantees a fair trial, not a perfect one ... A trial is fundamentally fair if it results

in a verdict reached through consideration of evidence properly admitted and which is untainted by improper influences. Thus, it is the totality of the effect of the alleged errors, not their mere presence or their number, which gives rise to, or defeats, a due process claim. [Citations omitted.]

745 F.2d at 482. Thus, with respect to Jones' charges of prosecutorial misconduct and improper evidentiary rulings, this Court will grant relief only if petitioner has shown that (1) errors or misconduct in fact occurred, and (2) such errors or misconduct were so egregious as to make it likely that the misconduct affected the trial's outcome or otherwise rendered Jones' trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 647–48, 94 S.Ct. 1868, 1871, 1873–74, 40 L.Ed.2d 431 (1974).[1]

## I

Jones' first ground for habeas relief is that the trial court erroneously allowed a forensic expert to testify that stains found on his undershirt were bloodstains. At trial, defense counsel objected to the introduction of this testimony on the basis of relevance, because the expert was unable to determine whether the blood was animal or human. Counsel argued that in light of the fact that Jones worked as a meat packer, the state was first required to show that the blood was human in order to establish the relevancy of the expert testimony. The trial court overruled the Defendant's objection.

Under both Fed.R.Evid. 402 and Illinois law, the basic test for the admissibility of evidence is the relevance of that evidence to a material issue in the case. *See People v. Currie*, 84 Ill.App.3d 1056, 1061, 40 Ill. Dec. 50, 405 N.E.2d 1142 (1980). In defining relevancy, Federal Rule of Evidence 401 incorporates the twin concepts of materiality and probative value into its definition:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Similarly, the test for relevancy under Illinois law is whether the fact offered tends to prove a disputed fact or render the matter in issue more or less probable in light of logic, experience, and accepted assumptions of human behavior. *Mueller v. Yellow Cab Co.*, 110 Ill.App.3d 504, 66 Ill.Dec. 169, 442 N.E.2d 595 (1982); *People v. Gardner*, 47 Ill.App.3d 529, 5 Ill.Dec. 701, 362 N.E.2d 14 (1977).

Jones argues, *inter alia*, that the evidence of blood on his undershirt is irrelevant to the issue of whether he shot Mr. Mabus because it rests on the unproven assumption that the stain was human blood. Jones cites *People v. Newbury*, 53 Ill.2d 228, 290 N.E.2d 592 (1972), for the proposition that evidence whose relevance depends entirely upon unproved assumptions must be excluded.

In *Newbury*, the trial court admitted into evidence a torn photograph found in Defendant's dresser drawer as relevant to the victim's state of mind and her feelings toward the Defendant. The Defendant objected to the admission of the torn photograph on the ground that there was no proof as to who tore it or when it was torn. The trial judge ruled, however, that the torn photograph could suggest an inference that it belonged to the victim and that she tore it; thus rendering the matter a question properly for the jury to consider.

---

1. As explained in *Shaw*, a sharply different test would apply if a trial error allegedly implicated a specific provision of the Bill of Rights. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held that when there is a constitutional error of this type, the criminal appellant nevertheless cannot prevail if the Court is persuaded that the error was harmless beyond a reasonable doubt. The burden of proving harmlessness falls on the state, as a beneficiary of the error. *Id.*, at 24, 87 S.Ct. at 828. By contrast, errors such as those alleged in the present case—which undermine a trial's fairness and implicate the Fourteenth Amendment directly rather than via a Bill of Rights guaranty—will justify habeas relief only if the petitioner shows that the error likely affected the trial's outcome. *Shaw*, 755 F.2d at 1281 n. 1.

The state supreme court reversed, stating that the "chain of inferences thus relied upon by the prosecution runs from the fact that the torn photograph was found in the victim's room to the fact that it was she who tore it, and that she had done so shortly before her death because of 'a disagreement between the defendant and the victim.'" *Newbury*, 53 Ill.2d at 239–40, 290 N.E.2d 592. The Court held that:

The difficulty with the photograph is not its hearsay aspect, but the fact that its relevance depended upon unproved assumptions—that it was torn recently and that it was torn deliberately and by the deceased. In the absence of further proof we are of the opinion that the photograph should have been excluded.

*Id.*

In the case *sub judice*, the Illinois appellate court read *Newbury* as holding only that relevance cannot be established by means of inferences which have no foundation in the evidence and which amount to no more than unproved assumptions. The Court held that this case differed from *Newbury* in that the inference that the blood found on Jones' T-shirt was the victim's had some basis in the evidence. For instance, the Court noted that the testimony indicated that Jones never went to work at the meat packing plant that day, and that witnesses who had seen Jones earlier in the day did not testify to the existence of bloodstains on his clothing at those times. *People v. Jones*, 108 Ill.App.3d at 885, 64 Ill.Dec. 346, 439 N.E.2d 1011.

█ This Court agrees that the testimony concerning the bloodstains found on Jones' clothing is relevant under the strict test for relevance set forth by Fed.R.Evid. 402 and Illinois law. Pursuant to that test, evidence of these bloodstains does to some degree advance the inquiry: it makes it at least slightly more probable that Jones was in fact the individual who shot the victim at close range.

█ The fact that the expert could not identify the blood as animal or human also does not necessarily mean that the relevance of the bloodstain rests solely on an unproven assumption. Under our legal system, which is molded by the tradition of jury trial and predominantly oral proof, a party does not offer his evidence *en masse*, but item by item. Thus, any single item of evidence, being but a single link in the chain of proof, need not conclusively prove the proposition for which it is offered. It is enough if the item could reasonably show that a fact is slightly more probable than it would be without the evidence. As stated by McCormick: "A brick is not a wall." *McCormick on Evidence*, 3d ed. § 185, at 543 (1984).

Unlike *Newbury*, there was in this case other evidence which, when combined with the bloodstains found on Jones' shirt, could reasonably lead to the conclusion that the blood was that of the victim. Under these circumstances, the fact that the bloodstains could not be positively identified as human goes to the weight that should be given such evidence by the jury. In this case, defense counsel's cross-examination of the expert fully exposed her inability to identify the blood as human, and the jury was thus informed as to the possibility that the bloodstains did not come from a human.

Because the above evidence is relevant, it is at least *prima facie* admissible. In reviewing Jones' conviction, however, the reviewing court did not consider whether the probative value of this evidence is outweighed by its costs—an argument raised by Jones throughout his appeals. Relevance alone is a threshold inquiry, since a great deal of evidence is excluded on the grounds that the risks of introducing such evidence outweigh the benefits. Such risks range all the way from inducing decision on a purely emotional basis at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Fed.R. Evid. 403 categorizes most of these costs:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Although not stated as such *per se*, Jones' contention is that the probative value of the evidence of blood on his shirt is outweighed by the danger of unfair prejudice.

Prejudice in this context does not simply mean damage to the opponent's cause.[2] Rather, "unfair prejudice within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 (Advisory Committee Notes).

■ It is arguable that in view of the degree of the evidence's probative value, the evidence of bloodstains on Jones' clothing has this kind of tendency. Although the fact that the blood could not be identified as human does not render the evidence irrelevant, it does substantially weaken its probative value. This fact, combined with the danger that the jury would base its decision on an emotional response, could lead to the conclusion that the danger of unfair prejudice outweighed the probative value of introducing the evidence of bloodstains.

However, even if this Court disagreed with the trial court, reversal would not be mandated even at the appellate court level. It is settled law that the standard of review of a relevancy ruling is abuse of discretion. *See Currie*, 84 Ill.App.3d 1056, 40 Ill.Dec. 50, 405 N.E.2d 1142; *Newbury*, 53 Ill.2d 228, 290 N.E.2d 592. Even assuming, *arguendo*, that this Court would find that the danger of undue prejudice outweighed the probative value of the bloodstains under the circumstances of the case, to rule otherwise would not constitute a clear abuse of discretion. As previously noted, the evidence of bloodstains on Jones' undershirt was relevant, and any danger of undue prejudice due to the introduction of this single piece of evidence is substantially

lessened by other evidence in this case, and the fact that the jury was fully informed of the possibility that the blood was not human blood.

Moreover, in this Court, the issue differs from that facing the Illinois Appellate Court: Here the question is not only whether the Court's relevance ruling was incorrect, but also whether, in light of the entire record, it so prejudiced Jones as to deprive him of a fair trial in violation of the Fourteenth Amendment. *Bibbs*, 506 F.2d at 1222. Although it is arguable that the trial court's admission of the evidence was technically incorrect, it did not so prejudice Jones as to deny him a fair trial. Numerous other items of evidence linked Jones to the attack that day (including, but not limited to, the green car in the driveway, Jones' clothing, the gun found nearby) and provided overwhelming evidence of his guilt. It is therefore highly improbable that withholding of the evidence concerning bloodstains would have had any effect on the jury's verdict. In the absence of at least some likelihood that the trial's outcome was affected by this error, habeas relief must therefore be denied. *Shaw*, 755 F.2d at 1281 n. 1. Given the strength of the state's case against Jones, only truly egregious errors in evidentiary rulings would pose the risk of violating Jones' due process rights. *See Palmer*, 738 F.2d at 170.

No such error was present in this case.

## II

Jones next claims that the trial court erred in exempting Detective Zirkelbach, the chief investigating officer, from a motion to exclude witnesses and allowing him to remain at counsel table throughout the trial. Jones argues that this prejudiced him because Zirkelbach testified at the beginning and end of the case and that this

---

**2.** *United States v. Monahan*, 633 F.2d 984, 985 (1st Cir.1980) (Rule 403 is not contravened by evidence that might show only that the defendant is guilty of the crime charged); *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir.1980) (Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case"); *Ramos v. Liberty*

*Mutual Insurance Co.*, 615 F.2d 334, 340 (5th Cir.1980), (" 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party"); *State v. Rollo*, 221 Or. 428, 438, 351 P.2d 422, 427 (1960) (remarking that advocate "is entitled to hit as hard as he can above, but not below, the belt").

amounted to an unfair corroboration of the testimony he heard during the trial.

■ Under Illinois law, it is within the trial court's discretion to permit a police officer who is a material witness to remain in the courtroom, and it is generally not reversible error to do so absent a showing of prejudice. *People v. Miller*, 26 Ill.2d 305, 186 N.E.2d 317 (1962); *People v. Toolen*, 116 Ill.App.3d 632, 647, 72 Ill.Dec. 41, 451 N.E.2d 1364 (1983) (grand jury). In *Miller*, the defendant argued that he was prejudiced by the officer's opportunity to hear the complaining witness testify before him. Rejecting this argument as grounds for reversal, the Court stated that "to accept this theory would be to adopt a rule allowing the exclusion of all witnesses as a matter of right and to ignore the established custom of the criminal courts." *Miller*, 26 Ill.2d at 307–08, 186 N.E.2d 317.

The central purpose of a motion to exclude witnesses is to ensure their credibility. *Cf. U.S. ex rel. Clark v. Fike*, 538 F.2d 750, 758 (7th Cir.1976) ("The rule that the prosecution cannot bring all its witnesses together prior to trial to discuss their testimony is one to ensure the credibility of the witnesses.") In *Miller*, the Illinois Supreme Court held that the mere fact that a witness listened to other prosecution witnesses before testifying did not unduly impede that witness' credibility.

While this conclusion may be subject to some doubt, the officer in this case was the first witness to testify. At least with respect to that testimony, therefore, his credibility could not have been influenced by the other witnesses. Detective Zirkelbach did again testify at the end of the trial, but that subsequent testimony could then be judged in light of its consistency with his initial testimony.

■ Although the validity of the state's practice of allowing witnesses to hear other witnesses testify prior to their testimony may be open to argument, the practice clearly does not constitute the kind of extreme error that constitutes a denial of fundamental fairness. Addressing this issue in *United States v. Escobedo*, 430 F.2d

603 (7th Cir.1970), the Seventh Circuit held that:

> It would, of course, have been better procedure for the government to have called Raebel at the beginning of the trial, so that he could not hear other witnesses' testimony before testifying himself. But the failure to exclude witnesses is not erroneous unless there is a clear abuse of discretion ...

*Id.* at 608–09. As this alleged ground for error does not raise serious due process concerns, Jones' petition must be denied on this ground.

### III

Jones' third and fourth ground for relief can be grouped together as alleged prosecutorial misconduct. Three major categories of misconduct are charged: (1) the prosecutor's argument that it does not create a reasonable doubt for the Defendant to merely take the stand and deny committing the crime, thereby improperly shifting the burden of proof; (2) the prosecutor's improper and inflammatory references to the jurors themselves; and (3) the prosecutor's suggestions that in order to believe the defense witnesses, the jury must find that each of the state's witnesses was lying.

#### Burden of Proof

■ As part of his closing argument, the prosecutor argued as follows:

> ... All the evidence in this case points to Richard Jones. I would submit to you that there is no doubt. He denies it. You can even believe his witnesses other than himself and he's guilty beyond all doubt. It doesn't create a reasonable doubt to take the stand and to say, "I didn't do it." ...

As noted by the appellate court, a prosecutor may not remark that a defendant has the burden of creating a reasonable doubt. However, reversal is required only where prosecutorial comments are such that the presumption of innocence is destroyed and a heavier burden is placed on the defendant than that required by law. *People v. Wit-*

ted, 79 Ill.App.3d 156, 34 Ill.Dec. 393, 398 N.E.2d 68 (1979); *People v. Weinstein*, 35 Ill.2d 467, 220 N.E.2d 432 (1966).

■ Here, the prosecutor was merely arguing that the state's evidence proved Jones guilty beyond a reasonable doubt and that Jones' own statement that he did not commit the crime should not be given enough weight to create such a doubt. Nowhere does the prosecutor attempt to convince the jury that the burden rests with the Defendant, or that it shifts to the Defendant in any manner. As this argument was proper, no due process concerns are raised.

### References to the Jurors

One of the prosecutor's final statements to the jury was an inflammatory argument intended to stimulate the juror's own fears:

> This is a tremendously serious case not only for the defendant, Richard Jones, but for the People of this County. If we're going to be safe and secure in our homes ... I think this case requires that you return verdicts of guilty ...

While the quoted remarks appear to be for the sole purpose of stimulating the juror's own fears and causing them to base their decision on an emotional response, the appellate court ruled that this was permissible comment on the evil results that could occur if the Defendant were released. *See People v. Balls*, 95 Ill.App.3d 70, 50 Ill.Dec. 463, 419 N.E.2d 571 (1981); *People v. VanZile*, 48 Ill.App.3d 972, 6 Ill.Dec. 747, 363 N.E.2d 429 (1977).

■ Remarks such as these do border on the hazy line that defines unacceptable comment. They do not, however, deprive a defendant of a fair trial where, as here, it cannot be said that there is a substantial likelihood the prosecutor's statement changed the jury's verdict. *Shaw*, 755 F.2d at 1281 n. 1.

The alleged misconduct in this case does not nearly approach the level of severity of the prosecutorial misconduct in *Bartall*, when in closing the prosecutor argued:

> For you now to come in here and buy some cocking [sic] bull story about a ricochet, some story about an accident, some story about the gun being up like that belies common sense, it belies common sense and it says to the People of the State of Illinois, well, someone else put another one over on a jury. Let's give him another shot, give him another shot. Maybe he'll blow Preze away, maybe he'll blow one of your relatives away next.

In *Bartall*, the Court felt that these and other statements "were patently designed to 'warp the factfinding function of the jury by deflecting its attention away from consideration of the evidence presented at trial.'" *Bartall*, 607 F.Supp. at 417 (*citing Crist*, 745 F.2d at 482). Despite what the Court felt were "outrageously unprofessional ... and prejudicial" remarks, the Court held that a new trial was not warranted in light of the strength of the case against Bartall. *Id.* at 418. (As in *Bartall* and *Crist*, the evidence of Jones' guilt was so convincing that it cannot be said that there is a substantial likelihood the prosecutor's comment changed the jury's verdict.) *Ergo, Bartall* and *Crist* control the present case, and Jones' petition must be denied on this ground.

### Argument Concerning State Witnesses

The final alleged incident of misconduct involves the prosecutor's argument to the jury that in order to believe defense witnesses, they would have to find that each of the state's witnesses was lying. At trial, the prosecutor cross-examined Jones as to his opinion of the veracity of the state's witnesses. With respect to almost every witness, Jones stated that he believed they were either lying or mistaken.

■ Generally, it is improper to tell the jury that they must find that each of the state's witnesses was lying in order to believe the Defendant's case, *People v. Cole*, 80 Ill.App.3d 1105, 36 Ill.Dec. 351, 400 N.E.2d 931 (1980), or to question a defendant as to his opinion of the veracity of other witnesses. *People v. Riley*, 63 Ill. App.3d 176, 19 Ill.Dec. 874, 379 N.E.2d 746 (1978). Such cross-examination is impermissible because it invades the province of

the jury, *People v. Graves*, 61 Ill.App.3d 732, 18 Ill.Dec. 829, 378 N.E.2d 293 (1978), and arguing that a jury must find that all the state's witnesses are lying in order to acquit constitutes "such a misstatement of the law as to prejudice the defendant and deny him a fair trial." *Cole*, 80 Ill.App.3d at 1108, 36 Ill.Dec. 351, 400 N.E.2d 931 (*citing United States v. Vargas*, 583 F.2d 380 (7th Cir.1978); *United States v. Phillips*, 527 F.2d 1021 (7th Cir.1975)).

■ Despite these general principles, such assertions are only improper if they lack support in the evidence. *Cole*, 80 Ill. App.3d at 1107, 36 Ill.Dec. 351, 400 N.E.2d 931. In this case, the allegedly improper argument and cross-examination was invited by Jones and was a necessary rebuttal to Jones' theory of the case. Part of Jones' theory was that he was the target of a police conspiracy, and that many of the state's witnesses were in fact lying in furtherance of the putative conspiracy. It was therefore proper for the prosecutor to comment on these charges, and to attempt to rebutt them by arguing that it is unbelievable that all the state's witnesses lied on the stand. Accordingly, no due process concerns are raised by this argument.

## IV

Jones' final ground for habeas relief is that the trial court erred in allowing Detective Zirkelbach to repeat the description of the attacker (given by Mabus approximately 15 minutes after the attack). Over defense objections, the trial court admitted the testimony under a hearsay exception for spontaneous declarations. Detective Zirkelbach then testified that Mabus was able to describe the essential features of the crime as well as a general description of the assailant. For instance, Zirkelbach stated that Mabus told him that the assailant was a black male, about six feet tall, and was wearing a dark blue vest, a light-colored shirt, dress-type Levi pants, and boots.

Jones argues that those statements were erroneously admitted because: (1) at least 15 minutes had elapsed between the attack and the statement itself, thereby allowing Mabus time for reflective thought; and (2)

the statement was in response to police questioning.

Both Illinois law and Fed.R.Evid. 803(2) provide a hearsay exception, regardless of the availability of the declarant, for:

a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

A cogent explanation of the basis for this exception is quoted by the Illinois Supreme Court in *People v. Damen*, 28 Ill.2d 464, 193 N.E.2d 25 (1963):

"A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him."

*Id.* at 471, 193 N.E.2d 25 (quoting *Keefe v. State*, 50 Ariz. 293, 72 P.2d 425 (1937) (Lockwood, J.)). Thus, the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event. *McCormick on Evidence*, 3d ed. § 297 at 856 (1984).

■ Although case law holds that the length of time between the event and the statement is not alone determinative of this issue, *see e.g., People v. Parisie*, 5 Ill.

**1492**

App.3d 1009, 287 N.E.2d 310 (1972), as the time between the event and the statement increases, so does the *reluctance to find the* statement an excited utterance. *See e.g., Marshall v. Thomason,* 241 S.C. 84, 127 S.E.2d 177 (1962) (statements to police officer 30 minutes after accident inadmissible).

 In the present case, it was reasonable for the trial judge to conclude that Mabus did not have the time or the opportunity to engage in such reflective thought. At the time the statement was made, Mabus was severely injured and clearly under the stress of his attack. This fact, combined with the short amount of time between the attack and his statement, provides clear support for the trial court's admission of this statement. *Cf. McCurdy v. Greyhound Corp.,* 346 F.2d 224 (3d Cir. 1965) (statement to police officer 15 minutes after accident admissible; testimony that declarant was still "nervous" and "shooken up" when police arrived); *Hilyer v. Howat Concrete Co., Inc.,* 578 F.2d 422 (D.C.Cir.1978) (statement made by worker between 15 and 45 minutes after fellow worker was fatally run over by truck, with evidence indicating continuing excitement); *United States v. Golden,* 671 F.2d 369 (10th Cir.1982) (statement 15 minutes after assault by officer, with 120 m.p.h. chase in interval). *May v. Wright,* 62 Wash.2d 69, 381 P.2d 601 (1963) (statement by witness to accident involving an automobile running over a child made 20 minutes after accident admissible; officer testified declarant "seemed upset"). Further, the fact that the statement was in response to police questioning, although a relevant factor, does not in our view alter this conclusion. *See Damen,* 28 Ill.2d at 472, 193 N.E.2d 25 ("The fact that the officer asked complainant 'what happened' is, we believe, insufficient to destroy its spontaneity.") Since the trial court's ruling on this matter was correct, no due process concerns are raised.

### Conclusions

There is no genuine issue of material fact, and no evidentiary hearing is required. 28 U.S.C. § 2254, Rule 8(a). The alleged prosecutorial misconduct and questionable evidentiary ruling herein discussed did not deprive Jones of a fair trial in violation of the Fourteenth Amendment. Since it is extremely improbable that the minimal technical errors discussed above changed the jury's verdict or otherwise rendered Jones' trial fundamentally unfair, Jones' petition for a writ of habeas corpus must be denied.

*Ergo,* it is ORDERED that Jones' petition for a writ of habeas corpus is DENIED.